IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 05-cv-00478-BNB-KLM

EDWARD J. KERBER,
NELSON B. PHELPS,
JOANNE WEST,
NANCY A. MEISTER,
THOMAS J. INGEMANN, JR.,
Individually, and as Representative of plan participants and plan beneficiaries of the QWEST
PENSION PLAN,

Plaintiffs,

v.

QWEST PENSION PLAN,
QWEST EMPLOYEES BENEFIT COMMITTEE,
QWEST PENSION PLAN DESIGN COMMITTEE, and
QWEST COMMUNICATIONS INTERNATIONAL, INC.,

Defendants.

---

## ORDER

---

This matter is before me on the **Defendants' Motion for Summary Judgment and
Brief in Support** [Doc. # 144, filed 10/31/07] (the "Motion"). The Motion is GRANTED.

## I. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the facts must be viewed in the light most
favorable to the party opposing the motion, and that party must be afforded the benefit of all
reasonable inferences to be drawn from the evidence. Adickes v. S. H. Kress & Co., 398 U.S.
144, 157 (1970). Rule 56(c), Fed.R.Civ.P., provides that summary judgment should be rendered
"if the pleadings, the discovery and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits the absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 447 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  <u>Trainor v. Apollo Metal Specialties, Inc.</u>, 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  <u>Celotex</u>, 447 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.   UNDISPUTED MATERIAL FACTS[1]

1.   Qwest is the successor-in-interest to U S WEST, Inc. ("U S WEST"), one of the Regional Bell Operating Companies created in 1984 when the American Telephone & Telegraph Company ("AT&T") divested itself of local telephone service.  In 2000, Qwest acquired and merged with U S WEST.  *Second Amended Complaint for Proposed Class Action Relief Under ERISA* [Doc. #29] (the "Complaint"), ¶ 16.  As a result of the merger, Qwest became and remains the sponsor of the Qwest Pension Plan, which is the successor to U S WEST's pension plans.  *Motion*, Ex. A-1, Bates 4569-70.

2.   The Qwest Pension Plan provides eligible employees and retirees with "employee pension benefits" and "employee welfare benefits."  The Qwest Employee Benefit Committee is the Qwest Plan's named fiduciary and is responsible for, among other things, administration of the Qwest Plan including the appointment of other fiduciaries and interpretation of the Qwest Plan's provisions.  Id. at Bates 4721-22, ¶¶ 8.4, 8.6, 8.8.

3.   The Qwest Pension Plan had several antecedent forms.  U S WEST initiated it with two pension plans, effective January 1, 1984, established as successors to the Bell System's pension plans: (1) the US WEST Pension Plan (the "1984 Occupational Plan"), and (2) the U S

---

[1]The parties have made factual assertions which are not followed by citations to supporting evidence or are not supported by their citations.  It is not a judicial function to search the parties' exhibits for evidence to support the factual statements.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  It is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).  I decline to search through the parties' exhibits for evidence to support factual statements, and I do not consider unsupported factual statements in my analysis of the Motion.  I also note that the plaintiffs often claim to dispute a paragraph containing factual statements, but they neither identify the specific fact in dispute nor otherwise establish the existence of a disputed material fact.  Unsupported general statements of dispute do not create a material fact dispute.

WEST Management Pension Plan (the "1984 Management Plan"). These two plans merged into a single plan, the U S WEST Pension Plan, effective January 1, 1993 (the "1993 Plan"). Following the merger of Qwest and U S WEST, the 1993 Plan was renamed the Qwest Pension Plan, effective January 1, 2001 (the "2001 Plan"). Id. at Bates 4569-70.

4. The 1984 Occupational and Management Plans included a "Death Benefit Plan" which provided for death benefits that could be paid to certain survivors of employees and retirees. The Sickness Death Benefit and the Accidental Death Benefit covered active employees. The Pensioner Death Benefit could be paid upon death to certain qualified beneficiaries, if they existed, of retired employees receiving a service pension or disability pension. Id. at Ex. A-2, Bates 3630-38, ¶ 5; Ex. A-3, Bates 3331-38, ¶ 5. Subsequent to the 1984 plans, the terms "Death Benefit Plan" and "Pensioner Death Benefit" were no longer used, but the benefits remained the same except as noted below.

5. The amount of the Pensioner Death Benefit is equal to twelve months' wages. Id. at Ex. A-2, Bates 3631-32; Ex. A-3, Bates 3332-33; Ex. A-4, Bates 4499; Ex. A-1, Bates 4716.

6. The Pensioner Death Benefit can be paid to a "mandatory beneficiary," i.e., either an "eligible surviving spouse," "eligible dependent children," "eligible dependent parent," or "other beneficiaries." If no eligible beneficiary is living at the time of a retiree's death, the benefit will not be paid, except for a discretionary burial expense of up to $500.00. Id. at Ex. A-2, Bates 3635-38; Ex. A-3, Bates 3333-38; Ex. A-4, Bates 4499-4500; Ex. A-1, Bates 4717.

7. In order to obtain the Pensioner Death Benefit, a claimant has to apply for payment within one year of the retiree's death. Id. at Ex. A-2, Bates 3644; Ex. A-3, Bates 3342; Ex. A-4, Bates 4501; Ex. A-1, Bates 4718, §7.7. Under the 2001 Plan, if a retiree's otherwise eligible

survivor filed suit against Qwest or previous plan sponsors "for damages on account of death of an employee," no benefit would be paid.  Id. at Ex. A-1, Bates 4746, § 13.13.

8.   Effective February 28, 1993, the plan limited eligibility for the Pensioner Death Benefit to individuals hired before March 1, 1993.  Id. at Bates 4719, §7.11.

9.   Commencing in 1997, certain management employees became eligible to elect a lump sum pay-out of their retirement benefits.  The Death Benefit Plan was amended to allow the inclusion in that lump-sum payment of a discounted version of the Pensioner Death Benefit that assumed the retiree would be survived by a beneficiary.  Id. at Bates 4716, § 7.3(c); *Plaintiffs' Brief in Opposition to [Docket No. 144] Defendants' Motion for Summary Judgment* [Doc. #146] (the "Response"), Ex. 1, 4710-11.  The lump sum option was also extended to occupational workers.  *Response*, Ex. 1, 4710-11.  Since July 1, 2000, approximately 8,216 people who were service pension eligible, as defined by the Qwest Pension Plan, separated from a participating company of the Qwest Pension Plan and elected to receive the "DLS Equivalent" of the death benefit, as defined in the Qwest Pension Plan.  *Response*, Ex. 22, ¶ 25.

10.   Effective January 1, 2004, Amendment 2003-5 eliminated the Pensioner Death Benefit for employees retiring on or after that date.  *Motion*, Ex. D.

11.   The 1984 Occupational Plan and the 1984 Management Plan each contain a reservation of rights clause.  The clause states:

> The Committee, with the consent of the Chairman of the Board or, at any time when there is no Chairman of the Board, the President; and subject to the approval of the Board of Directors (or without such approval in the case of changes which, in the opinion of the Committee, are dictated by requirements of federal or state statutes applicable to the Company or to other Participating Companies or authorized or made desirable by such statutes) may from time to time make changes in the Plan as set forth in this document, and

the Company may terminate said Plan, but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder.

Id. at Ex. A-2, Bates 3661; Ex. A-3, Bates 3387.

12. The 1993 Plan contains the following reservation of rights clause:

U S WEST expects this Plan to be permanent, but as future conditions cannot be foreseen it reserves the right to amend the Plan at any time, without prior notice to anyone. The Plan may be amended by a writing approved by U S WEST's Board of Directors and signed on behalf of U S WEST by an officer of U S WEST duly authorized by the Board of Directors. The Plan may also be amended in writing by the Committee to the extent authority to amend the Plan has been delegated to the Committee by the Board of Directors. Each amendment shall be effective on such date as U S WEST or its delegee may determine. No amendment or modification that affects the rights, powers, privileges, immunities or obligations of the Trustee may be made without the consent of the Trustee. Amendments may modify the rights and interests of Employees who are Participants in the Plan at the time thereof as well as future Participants but amendments may not diminish the accrued benefit of any Participant as of the effective date of such amendment or divert any funds in the Trust to purposes other than for the exclusive benefit of Participants and their beneficiaries. Id. at Ex. A-4, Bates 4508.

13. The 2001 Plan provides the following reservation of rights clause:

The Company expects this Plan to be permanent, but as future conditions cannot be foreseen it reserves the right to amend the Plan at any time, without prior notice to anyone. The Plan may be amended by a writing approved by the Company's Board of Directors and signed on behalf of the Company by an officer of the Company duly authorized by the Board of Directors. The Plan may also be amended in writing by the Plan Design Committee or other persons(s) [sic] to the extent authority to amend the Plan has been delegated to the Plan Design Committee or such person(s) by the Board of Directors. Each amendment shall be effective on such date as the Company or its delegee may determine. No amendment or modification that affects the rights, powers, privileges, immunities or obligations of the Trustee may be made

> without the consent of the Trustee.  Amendments may modify the
> rights and interests of Employees who are Participants in the Plan
> at the time thereof as well as future Participants but amendments
> may not diminish the accrued benefit (as defined in Section
> 411(d)(6) of the Code) of any Participant as of the effective date of
> such amendment.

Id. at Ex. A-1, Bates 4730, § 11.4.

14.   Plan participants were periodically provided with Summary Plan Descriptions ("SPDs") that summarized Plan benefits.  *Motion*, Ex. B-1 through Ex. B-4.

15.   Plaintiffs Kerber and Phelps both retired effective February 28, 1990, from U S WEST and receive "service pension annuities" from the Plan.  *Complaint*, ¶ 5,7.  All of the remaining plaintiffs retired from Qwest after January 1, 2004.  West and Meister each received lump sum payments that did not include a death benefit payment.  Id. at ¶¶ 9,11.  Ingemann currently receives a service pension annuity.  Id. at ¶ 13.

16.   No plaintiff died between 1984 and 1993.  Id. at ¶¶ 5-14.

The plaintiffs' Complaint is not a model of clarity.  It asserts four claims for relief, but the claims do not clearly state the legal bases for the relief sought.

Claim One is entitled "Breach of Fiduciary Duty and Equitable Estoppel Due to Failure to Disclose Material Information; Requested Equitable and Remedial Relief."  The claim for breach of fiduciary duty is brought pursuant to the Employee Retirement Income Security Act ("ERISA"), Section 404(a), 29 U.S.C. § 1104(a).  It seeks an order "forbidding Defendants and [their] successors from ever altering, modifying, eliminating or terminating Named Plaintiffs' and the proposed class of PLAN participants' expected Pension Death Benefits in the absence of a PLAN termination."

Claim Two is captioned "Violations Due to Illegal Elimination of Pension Death Benefit." It alleges that the Pensioner Death Benefit vested when excess assets were transferred from the Plan pursuant to 26 U.S.C. § 420 and, therefore, changes to the Pensioner Death Benefit violate ERISA.

Claim Three requests a declaratory judgment pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), regarding the rights of retired employees "and their mandatory beneficiaries" to receive the death benefit.

Claim Four is brought pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), or in the alternative Section 502(a)(3), 29 U.S.C. § 1132(a)(3), for correction of "faulty plan documents." The plaintiffs seek equitable relief requiring the defendants to (1) amend the Plan to declare that "the Pension Death Benefit is a vested, protected and accrued defined pension benefit" that cannot be reduced or terminated absent the Plan's termination, or (2) insert language into Plan documents "memorializing the Pension Death Benefit [as] an entitlement."

## III.  ANALYSIS

Before it was amended in December 2003, the 2001 Plan provided a Pensioner Death Benefit equal to one year's salary and payable from the assets of the Qwest Plan to qualifying beneficiaries of retired Plan participants who died while receiving either a service pension or a disability pension annuity. Plan Amendment 2003-5 amended the 2001 Plan to eliminate the death benefit from those benefits available to employees retiring on or after January 1, 2004. In addition, Qwest has stated that the death benefit is not an accrued benefit and that it is considering eliminating the death benefit for all retirees regardless of their retirement date.

The plans at issue in this case are employee pension benefit plans subject to ERISA. This action challenges Plan Amendment 2003-5 and the statements by Qwest that it may eliminate the death benefit generally, arguing that the Plan Amendment is illegal and that the Pensioner Death Benefit "should be treated as a vested, protected or accrued pension benefit under the [Plan]." Complaint, ¶ 1. The plaintiffs claim a right to receive the Pensioner Death Benefit under several theories. I address them in the order presented by the defendants' Motion.

## A. Claim Three

In Claim Three, the plaintiffs seek a declaratory judgment pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), regarding the rights of retired employees and their beneficiaries to receive the Pensioner Death Benefit.

ERISA was enacted "to encourage the establishment and growth of private pension plans and to protect the interests of participating employees in those plans by mandating the adoption of fair and equitable plan provisions for participation and preretirement vesting." Ronald J. Cook, *ERISA Practice and Procedure*, pp. 4-2 to 4-3 (2d ed. 2006). A major problem affecting private pension plans prior to the enactment of ERISA was that an employee's right to a pension did not necessarily vest until the employee became eligible to receive the pension. Id. at p. 4-105.

To remedy this problem, ERISA requires that certain specified pension benefits must vest in employees with significant periods of service:

> In enacting ERISA, Congress intended to correct the inequity brought about by the termination of a long-term employee before reaching retirement age by requiring all covered pension plans to provide for preretirement vesting determined solely by years of service.

Id.

The idea of the vesting of benefits is one of the touchstones of ERISA.  The House

Report which recommended passage of ERISA includes the following statement:

> [I]ts most important purpose will be to assure American workers
> that they may look forward, with anticipation, to a retirement with
> financial security and dignity, and without fear that this period of
> life will be lacking in the necessities to sustain them as human
> beings within our society.

H.R. Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 US Code Cong & Admin News 4639.

To effectuate this fundamental purpose, ERISA was structured as follows:

> In general, ERISA § 203, I.R.C. § 411, and interpretive
> Regulations of the Department of Labor and Treasury provide for
> an employee's nonforfeitable (vested) right to his or her normal
> retirement benefit upon the attainment of normal retirement age.
> Statutory vesting applies only to pension benefits (not welfare
> plans) and is a matter of substantive right under ERISA and a
> requirement for tax qualification under the I.R.C.

*Cook* at pp. 4-104-105.

ERISA applies to both employee *pension* benefit plans and employee *welfare* benefit

plans. Id. at p. 2-3.   An employee *pension* benefit plan is:

> **[A]ny plan**, fund or program which was heretofore or is hereafter
> established or maintained by an employer, or by an employee
> organization or by both, **to the extent that** by its express terms or
> as a result of surrounding circumstances **such plan, fund or
> program–**

(I) **provides retirement income to employees**, or
(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A) (emphasis added).

An employee *welfare* benefit plan is defined as:

> **[A]ny plan**, fund, or program which was heretofore or is hereafter established or maintained by an employer, or by an employee organization, or by both, to the extent that such plan, fund, or program was **established or is maintained for the purpose of providing for its participants or their beneficiaries**, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or **benefits in the event of** sickness, accident, disability, **death** or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in 29 U.S.C. Section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1) (emphasis added).

The primary difference between a *pension* plan and a *welfare* plan "is the nature of the benefit furnished--a **pension** plan provides retirement income or other deferred income, while a **welfare** plan provides benefits upon the occurrence of various specified contingencies." *Cook* at pp. 2-16 to 2-17 (emphasis added).

An accrued pension benefit is protected by ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), regardless of whether it has vested:[2]

---

[2]Accrual refers to "the rate at which an employee earns benefits to put in the employee's pension account" and vesting refers to "the process by which an employee's already-accrued pension account becomes" nonforfeitable or "irrevocably the employee's property." In re Lucent Death Benefits ERISA Litig., __ F.3d ___, 2008 WL 3929793 (3d Cir. Aug. 28, 2008).

> Nonforfeitability of accrued benefits is . . . a seminal provision of [ERISA], and any provision or action which works a forfeiture of accrued benefits is strictly forbidden. It is important to note, however, that only accrued benefits are entitled to the protections of nonforfeitability. Other or "ancillary" benefits are not similarly protected, and these latter benefits may be forfeited without offending ERISA.

*Cook*, p. 4-120.

"In contrast, a welfare benefit is protected from elimination only if the plaintiff proves by a preponderance of the evidence that the plan provided had intended the welfare benefit to have vested (despite not being obliged to do so by ERISA)." In re Lucent, 2008 WL 3929793, at *2.

## 1. Is the Pensioner Death Benefit a Pension Benefit or a Welfare Benefit?

The plaintiffs seek a declaration that the defendants may not change or eliminate the Pensioner Death Benefit. *Complaint*, pp. 42-43. The defendants assert, and the plaintiffs do not dispute, that in order to obtain the declaration they seek, the plaintiffs must establish that the Pensioner Death Benefit was either (1) an accrued pension benefit or (2) a welfare benefit that contractually vested by virtue of the plan's language and was, therefore, protected from reduction or elimination by ERISA's anti-cutback rule. *Motion*, pp. 8-12.

"Questions involving the scope of benefits provided by a plan to its participants must be answered initially by the plan documents, applying the principles of contract interpretation." Chiles v. Ceridian Corp., 95 F.3d 1505, 1515 (10th Cir. 1996). Federal common law provides the basis for the contract interpretation. Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249 (10th Cir. 2007). Federal common law requires a court to "examine the plan documents as a whole and, if unambiguous, construe them as a matter of law." Id. at 1250. "Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is

uncertainty as to the meaning of the term." Id. To determine if ambiguity exists, I consider "the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." Id. (internal quotations and citation omitted). I may consider extrinsic evidence only if the plan terms are ambiguous. Bill Gray Ent., Inc. Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001).

The plaintiffs' response brief is confusing and in some respects nonresponsive to the defendants' Motion. In the section addressing Claim Three, the plaintiffs set forth many arguments--some appear to contend that the Pensioner Death Benefit is an accrued pension benefit, and some appear to contend that it is a welfare benefit that has contractually vested--but most arguments fail to clearly identify which point is being made. *Response*, pp. 7-22.

The plaintiffs state that "Kerber and Phelps contend the Governing Plan document and SPD in effect upon their becoming service pension eligible and retiring in February 1990 should be enforceable, not later document revisions. Accordingly, the Governing Plan document as existed January 1, 1984 through December 28, 1994 is controlling." *Response*, p. 7. The record contains plans dated 1984, 1993, and 2001, *Motion*, Ex. A-2, A-3, A-4, and A-1, as well as a plan amendment dated 1997. Id. at Ex. A-5.[3] The record does not contain a plan that existed from January 1, 1984 through December 28, 1994, and I assume that the plaintiffs' reference to December 28, 19<u>94</u>, is a typographical error. In addition, the plaintiffs do not state which documents should govern the remaining plaintiffs' claims. In the interests of efficiency and

_____

[3]The plaintiffs attach as Exhibit 1 to their Response an excerpt of a document which appears to be a plan. The exhibit does not identify the particular plan from which the excerpt was taken. The plaintiffs refer to Exhibit 1 as an excerpt from the 1997 plan amendment, however. *Response*, p. 3, ¶ 6.

thoroughness, I address the language of all plan documents referred to and provided by the parties.

The terms of the plan documents are not ambiguous.[4]  The same general definition of the Pensioner Death Benefit is found in all versions of the plans.  The Pensioner Death Benefit is equal to twelve months salary and is paid to a qualified beneficiary upon death of the retired participant in a lump sum or in installment payments; it is not paid annually or upon retirement of the participant.  *Motion*, Ex. A-2, Bates 3632-3645 (the 1984 Management Plan); Ex. A-3, Bates 3333-43 (the 1984 Occupational Plan); Ex. A-4, Bates 4499-4501 (the 1993 Plan); Ex. A-1, Bates 4716-19 (the 2001 Plan).  Thus, the Pensioner Death Benefit does not meet ERISA's definition of a pension benefit because it does not provide "retirement income to employees," nor does it "result in a deferral of income."

Moreover, payment of the Pensioner Death Benefit depends on the occurrence of specified contingencies.  If no eligible beneficiaries are living at the time of a retiree's death, the benefit will not be paid.  Id. at Ex. A-2, Bates 3633-35, 3644(the 1984 Management Plan); Ex. A-3, Bates 3333 (the 1984 Occupational Plan); Ex. A-4, Bates 4499 (the 1993 Plan); Ex. A-1, Bates 4716-17 (the 2001 Plan).  Under the 2001 Plan, the Pensioner Death Benefit will not be paid if a retiree's otherwise eligible survivor files suit against Qwest or previous plan sponsors "for damages on account of death of an employee."[5]  Ex. A, Bates 4717-18, 4746 (the 2001 Plan).  In short, the Pensioner Death Benefit is established for the purpose of providing benefits

---

[4]Therefore, I do not look to extrinsic evidence to interpret the terms of the plan documents.

[5]The terms of the other plans may contain this contingency.  However, neither party has cited to any portion of the record containing this contingency in plans other than the 2001 Plan.

for participants' beneficiaries in the event of death--the very definition of a welfare benefit under ERISA. 29 U.S.C. § 1002(1). <u>See also</u> <u>Foss v. Lucent Technologies, Inc.</u>, No. 03-CV-5017(DMC), 2006 WL 3437586, at *5-8 (D. N.J. Nov. 27, 2006) (analyzing plan documents substantially similar to the documents at issue here and finding that the pensioner death benefit is a welfare benefit); <u>In re Lucent</u>, 2008 WL 3929793 (upholding the district court's holding in <u>Foss</u>).

The plaintiffs argue that the Pensioner Death Benefit is a pension benefit and not a welfare benefit because the SPDs identified the Pensioner Death Benefit as part of the pension plan. *Response*, pp. 10-11. Specifically, the plaintiffs state that "[e]very SPD issued during 1984 through at least 1999" contained the following language:

> **Type of Plan**. The Plan is classified as both a pension plan and a welfare plan under the definitions of ERISA. **It is a "defined benefit plan"** for service and deferred vested pension purposes and **for payment of certain sickness death benefits upon the death of a Pension Plan participant.** The Plan is a "welfare plan" for purposes of providing disability pensions and other benefit payments.

<u>Id.</u> at p. 10. The plaintiffs further state that the SPD issued in April 2003 states that the only welfare benefits provided by the Plan are those benefits paid from insurance policies out of operating revenues. <u>Id.</u> at p. 11.

Contrary to the plaintiffs' argument, an employer's label for a particular benefit cannot supercede the clear directives of ERISA. <u>Rombach v. Nestle USA, Inc.</u>, 211 F.3d 190, 193-94 (2d Cir. 2000). Under ERISA, any plan is a welfare plan "to the extent that such plan" provides "benefits in the event" of "death." 29 U.S.C. § 1001(1). The meaning and function of the

Pensioner Death Benefit are clear; it is a benefit triggered by death and is, therefore, a welfare benefit.[6]

The plaintiffs also argue that the Pensioner Death Benefit is a pension benefit and not a welfare benefit because "U S WEST sent Annual Form 5500 reports to the U.S. Department of Labor and the Internal Revenue Service" which contained "schedules confirming the [Pensioner Death Benefit] liability was included in the *vested benefits* accounting column." *Response*, p. 11 (emphasis in original).

The plaintiffs cite Stern v. International Business Machines Corp., 326 F.3d 1367, 1374 (11th Cir. 2003), in support of their view that these extrinsic documents can be viewed in determining whether the Pensioner Death Benefit is a pension benefit or a welfare benefit. *Response*, p. 12. However, the court in Stern was not analyzing whether a particular benefit was a welfare benefit or a pension benefit under the unambiguous terms of a pension plan. The court was instead determining whether an employer's "Sickness and Accident Income Plan" was covered by ERISA and could, therefore, be the basis for removal of the case from state to federal court. The court acknowledged the defendant's assertion that it filed annual Form 5500 reports wherein it identified the program as an ERISA plan, but noted that the defendant did not offer any supporting documentation and stated that "even if [the defendant] has treated the Program as an ERISA plan with respect to government filings, its mere labeling of the plan should not determine whether ERISA applies." Id. at 1373-74.

---

[6]In addition, I note that the language quoted by the plaintiffs appears to support an argument that the Pensioner Death Benefit is described by the employer as a welfare benefit. The description states that certain sickness death benefits are pension benefits whereas other death benefits (*i.e.*, accident death benefits and the Pensioner Death Benefit) are welfare benefits. *Response*, p. 10.

The plaintiffs also cite <u>Kanne v. Connecticut Gen. Life Ins.</u>, 867 F2d 489, 492 (9th Cir. 1988), in support of their statement that I should consider the annual Form 5500 reports. However, <u>Kanne</u> does not support the plaintiffs' statement, and it is unclear why the plaintiffs cited it.

In another attempt to persuade me to consider extrinsic evidence (in the form of affidavits of past and present employees), the plaintiffs assert that an ERISA plan is to be interpreted like any other contract and "under ordinary principles of contract interpretation, 'a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.'" *Response*, p. 12 (citing Restatement (Second) of Contracts, § 223). While it is true that principles of contract interpretation are used to determine the scope of benefits provided by a plan, <u>Chiles</u>, 95 F.3d at 1515, the plaintiffs do not cite any federal common law, nor can I find any, which requires examination of the parties' course of dealing when determining whether a benefit is a pension benefit or a welfare benefit pursuant to unambiguous plan terms.

In examining a pensioner death benefit almost identical to the Pensioner Death Benefit in this case, the Third Circuit Court of Appeals recently stated:

> The pensioner death benefit neither provides retirement income to employees nor results in a deferral of income by employees. <u>See</u> 29 U.S.C. § 1002(2)(A) (defining pension plan); <u>see also</u> <u>Oatway v. American Int'l Group, Inc.</u>, 325 F.3d 184, 189 (3d Cir.2003) (concluding that a plan that was not "created for the purpose of providing retirement income" was not a pension plan). Moreover, it could not be an accrued pension benefit since it is not "an annual benefit" and it does not "commenc[e] at normal retirement age." <u>See</u> 29 U.S.C. § 1002(23); <u>see generally</u> <u>Bencivenga v. W. Pa. Teamsters & Employers Pension Fund</u>, 763 F.2d 574, 577 (3d Cir.1985) (discussing accrued pension benefits). Nor does the pensioner death benefit directly relate to an accrued benefit by paying out an accumulated amount of accrued benefits. <u>See</u>, <u>e.g.</u>, <u>West v. AK Steel Corp.</u>, 484 F.3d 395, 410-11 (6th Cir.2007).

Instead, the pensioner death benefit provides "benefits in the event of ... death." See 29 U.S.C. § 1002(1) (defining a welfare plan). This fits readily within the definition of a welfare benefit. As the Second Circuit Court of Appeals has explained, the fact that a welfare benefit appears in a larger plan that also provides pension benefits does not change the character of that welfare benefit. See Rombach v. Nestle USA, Inc., 211 F.3d 190, 193-94 (2d Cir.2000) (discussing McBarron v. S & T Indus. Inc., 771 F.2d 94 (6th Cir.1985)). As in Rombach, the "meaning and function" of the pensioner death benefit "remain[ ] clear" despite surrounding benefits or the use of the word "Pensioner" to describe the benefit. See id. at 194.

* * *

Nor does the asserted fact that the pensioner death benefit has characteristics "consistent with" or "not inconsistent with" a pension benefit change its character. The amount and calculation method of the pensioner death benefit, the identity of the recipient of payment, and the treatment of the pensioner death benefit for tax, accounting, and plan termination purposes, are relevant details for administrators of the plan, but they do not change the fundamental character of the benefit. The type of benefit provided, not other considerations, determines whether a plan is a pension plan or a welfare plan. Indeed, the statutory definition of pension plans specifically states that a plan providing the relevant type of benefits is a pension plan "regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A). We accordingly will not give weight to these factors in the face of the unambiguous provision of welfare benefits rather than pension benefits. . . .

Any claimed reliance on a belief that the pensioner death benefit is a pension benefit also is irrelevant to the character of the pensioner death benefit. . . .

In re Lucent, 2008 WL 3929793, at *4-5 (upholding the district court's holding in Foss, 2006 WL 3437586.

The plaintiffs attempt to distinguish themselves from Foss and In re Lucent by arguing that the 1993 Plan was amended to give employees taking early retirement the option of selecting a lump sum pay out of their retirement benefits which included a discounted version of

the Pensioner Death Benefit, thereby making the Pensioner Death Benefit an "optional form of benefit" protected by the anti-cutback provision. *Response*, pp. 1-2; p. 3, ¶ 6; pp. 17-21.

The anti-cutback provision provides:

> (g) Decrease of accrued benefits through amendment of plan
>
> > (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.
> >
> > (2) For purposes of paragraph (1), a plan amendment which has the effect of--
> >
> > > (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
> > >
> > > (B) eliminating **an optional form of benefit**,
> >
> > with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary of the Treasury shall by regulations provide that this paragraph shall not apply to any plan amendment which reduces or eliminates benefits or subsidies which create significant burdens or complexities for the plan and plan participants, unless such amendment adversely affects the rights of any participant in a more than de minimis manner. The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B) (other than a plan amendment having an effect described in subparagraph (A)).

29 U.S.C. § 1054(g) (emphasis added).

The plaintiffs state that ERISA's anti-cutback provision prohibits a plan amendment that eliminates or reduces an optional form of benefit, and "[a]n optional form of benefit exists for

purposes of ERISA's anti-cutback rule when a plan participant has a choice as to how payments will be made or applied to him." Id. at pp. 17-18 (internal quotations omitted). In support of their assertion, the plaintiffs point to Ross v. Pension Plan for Hourly Employees of SKF Indus., Inc., 847 F.2d 329, 333 (6th Cir. 1988) and 26 C.F.R. § 1.411(d)-4 Q & A-1(b) (2007).

In Ross, the court defined an optional benefit as "generally one that involves the power or right of an employee to choose the way in which payments due to him under a plan will be made or applied." Ross did not further define an optional benefit. Section 1.411(d)-4 Q & A-1(b), however, provides that optional benefits are protected "to the extent they have accrued." Thus, neither Ross nor Section 1.411(d) support the plaintiffs' assertion that the Pensioner Death Benefit is an optional form of benefit under the anti-cutback rule.

The plaintiffs also cite to Counts v. Kissack Water & Oil Serv., Inc., 986 F.2d 1322, 1324 (10th Cir. 1993) for the proposition that "[c]ourts have unanimously concluded ERISA specifically protects a participant's right to receive an optional lump-sum payment." Response, p. 19. In Counts, the district court upheld the Plan Administrator's refusal to pay the plaintiff's retirement benefits in a lump sum payment. The appellate court reversed, finding that, in violation of ERISA's anti-cutback rule, the Plan was improperly amended to eliminate an optional form of an accrued retirement benefit.

As discussed above, the Pensioner Death Benefit is not an accrued retirement benefit; it is a welfare benefit. The plaintiffs do not offer any authority to support their assertion that the Pensioner Death Benefit changes its character upon inclusion in a lump sum pay out of accrued retirement benefits upon early retirement. To the contrary, the Plan states that the lump sum retirement benefit "shall be increased by the DLS Equivalent of the Death Benefit" and [f]or this

purpose only, the DLS Equivalent shall include an assumption that the Participant will be survived by a Beneficiary." *Motion*, Ex. A-1, Bates 4716, § 7.3(c). Thus, the Pensioner Death Benefit retains its fundamental nature: it remains a benefit that is separate and distinct from the pension benefit, and its DLS Equivalent includes an actuarial assumption that reflects its contingent nature (survival by a qualified beneficiary). Inclusion in the lump sum election does not change it into an accrued pension benefit.

Finally, the plaintiffs argue that the Pensioner Death Benefit is a "retirement-type subsidy" under the anti-cutback provision of ERISA Section 204(g)(2)(A), 29 U.S.C. 1054(g)(2)(A). The plaintiffs do not cite to any authority to support their argument. Indeed, their argument in its entirety consists of the following:

> Since the DLS Equivalent adds significant value above the accrued pension benefit, reduced to present value for immediate optional lump-sum payment, the DLS Equivalent is deemed to be a "retirement-type subsidy," also protected by ERISA § 204(g)(2)(A)'s anti-cutback prohibition. Defendants can present no evidence that continuing the practice of factoring in the DLS Equivalent of the PDB, when paying the single-sum option created the significant burdens or complexities for the Plan. After all, this payment practice lasted about seven full years, causing no problems for the Plan.

*Response*, pp. 20-21.

In 1984, Congress passed the Retirement Equity Act ("REA"), now ERISA § 204(g), which provides that early retirement benefits and retirement-type subsidies shall be treated as accrued benefits for purposes of the Anti-Cutback Rule.[7] Specifically, Section 204(g)(2)(A) provides that "a plan amendment which has the effect of ... eliminating or reducing an early

_____

[7]ERISA section 204(g) mirrors Internal Revenue Code section 411(d)(6).

retirement benefit or retirement-type subsidy ... with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits."  29 U.S.C. 1054(g)(2).

Congress did not define the term "retirement-type subsidy" when it enacted the REA. However, the legislative history of the REA provides insight into the definition:

> The bill provides that the term 'retirement-type subsidy' is to be defined by Treasury regulations.  The Committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy.  The Committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, ***a death benefit*** (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) will not be considered a retirement-type subsidy.

S. Rep. No. 98-575, at 30 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 2547, 2576 (emphasis added).  Thus, Congress did not intend to include death benefits within the definition of "retirement-type subsidies."

The Department of Treasury's definition of retirement-type subsidy, although not effective until August 12, 2005, also provides guidance:

> The term retirement-type subsidy means the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences.  Examples of retirement-type subsidies include a subsidized early retirement benefit and a subsidized qualified joint and survivor annuity.

26 C.F.R. § 1.441(d)-3(g)(6)(iv)(B).  Indeed, the plaintiffs include the Department of Treasury's definition in a footnote, but do not explain how it applies to the facts of this case.  *Response*, p. 20, n.13.

The plaintiffs' argument is conclusory and inadequately developed. The plaintiffs fail to provide any evidence to demonstrate that the Pensioner Death Benefit fits into the Department of Treasury's definition (or any other definition) of a retirement-type subsidy, and in particular they fail to create a material fact dispute regarding whether the Pensioner Death Benefit is a retirement-type subsidy subject to ERISA's anti-cutback provision.

## 2. Did the Pensioner Death Benefit Contractually Vest?

Because the Pensioner Death Benefit is a welfare benefit, it is "exempt from the statutory vesting requirements that ERISA imposes on pension benefits," Member Services Life Ins. Co. v. American Nat'l Bank and Trust Co., 130 F.3d 950, 954 (10th Cir. 1997) (internal quotations and citation omitted), and it is not subject to ERISA's anti-cut back provision. Rombach, 211 F.3d at 192-93. Indeed, Qwest may "amend the terms of a welfare benefit plan or terminate it entirely." Welch v. Unum Life Ins. Co. of America, 382 F.3d 1078, 1083 (10th Cir. 2004) (internal quotations and citation omitted).

However, Qwest may still be prohibited from reducing or eliminating the Pensioner Death Benefit if it has vested by contract. "Nothing in ERISA . . . forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan . . . ." Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 77 (2d Cir. 1996).

The Tenth Circuit Court of Appeals has stated:

> Vested benefits are those which are nonforfeitable. Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 376, 100 S.Ct. 1723, 1733-34, 64 L.Ed.2d 354 (1980). Benefits provided under a welfare benefit plan need never vest. Curtiss-Wright Corp. v. Schoonejongen, ---U.S. ----, ----, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995); Pitman v. Blue Cross and Blue Shield, 24 F.3d

118, 121 (10th Cir.1994). Congress intentionally exempted welfare benefit plans from ERISA vesting requirements, determining that "[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1160 (3d Cir.1990) (citing H.R.Rep. No. 807, 93rd Cong., 2d Sess. 60).

An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits. Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir.1990); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990), cert. denied, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991). A plan sponsor who changes the vested benefits granted in a welfare plan may be liable to a beneficiary under the plan. 29 U.S.C. § 1132(a)(1),(3); see also, e.g., Wheeler v. Dynamic Eng'g Inc., 62 F.3d 634, 639-40 (4th Cir.1995).

Chiles, 95 F.3d at 1510.

"[P]laintiffs carry the burden of showing an agreement or other demonstration of employer intent to have company-paid [benefits] vest under the plan." Id. at 1511. Contractual vesting is not inferred:

Because an employee benefit plan must be established by a "written instrument," 29 U.S.C. § 1102(a)(1), a promise to provide vested benefits "must be incorporated, in some fashion, into the formal written ERISA plan." Jensen v. SIPCO, 38 F.3d 945, 949 (8th Cir.1994) (quotation omitted), cert. denied, 514 U.S. 1050, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995). SPDs are considered part of the ERISA plan documents. 29 U.S.C. § 1022(a)(1); Alday, 906 F.2d at 665. In interpreting the terms of an ERISA plan we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law. Kemmerer v. ICI Americas Inc., 70 F.3d 281, 288-89 (3d Cir.1995), cert. denied, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996). In this case we apply the de novo standard of review to interpret the terms of a plan, Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989), "giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would

> have understood the words to mean," <u>Blair v. Metropolitan Life Ins. Co.</u>, 974 F.2d 1219, 1221 (10th Cir.1992) (quoting <u>McGee v. Equicor-Equitable HCA Corp.</u>, 953 F.2d 1192, 1202 (10th Cir.1992)) (emphasis omitted).

<u>Id.</u>

The plaintiffs argue that the Pensioner Death Benefit vested because the termination clauses of all plan documents prioritize the payout of the Pensioner Death Benefit at "a higher payment priority status than many deferred vested pension benefits which indisputably are accrued benefits." *Response*, p. 17. The termination clause prioritizes the payout for benefits as required by ERISA Section 4044, 29 U.S.C. § 1344(a). "Such prioritization of benefits pursuant to Section 4044 does not create vesting rights; but rather 'insurance' upon termination of a plan." <u>Foss</u>, 2006 WL 3437586, at *9.

The plaintiffs also argue that the Pensioner Death Benefit vested based on language in the plans and SPDs which state that the Pensioner Death Benefit "will be paid" and that beneficiaries are "entitled" to collect the Pensioner Death Benefit. *Response*, pp. 14-16. However, "[c]ontractual vesting of a welfare benefit is an extra-ERISA commitment that must be stated in clear and express language." <u>Chiles</u>, 95 F.3d at 1513 (internal quotations and citation omitted). The language cited by the plaintiffs is not a clear and express commitment to vest the Pensioner Death Benefit. Rather, the language merely describes the benefit assuming it remained available at the time of the retiree's death. Nothing in the language quoted by the plaintiffs promises that the Pensioner Death Benefit would not be eliminated in the future. Moreover, other provisions of the plan documents make clear that the benefit does not vest until the plan participant dies.

In addition, the plans contain reservation of rights clauses which inform the participant that the plans may be amended or terminated. *Motion*, Ex. A-2, Bates 3661 (1984 Management Plan); Ex. A-3, Bates 3387 (1984 Occupational Plan); Ex. A-4, Bates 4508 (1993 Plan); Ex. A-5, Bates 4128-29 (1997 Amendment); Ex. A-1, Bates 4730 (2001 Plan).

Plaintiffs Kerber and Phelps argue that when they retired in 1990, the SPD in effect did not contain a clear and conspicuous reservation of rights clause but instead contained the following clause:

> U S WEST reserves the right to terminate this Plan at any time. . . The current provisions of the Plan states that if there are any remaining assets . . . .  **It should be noted that, as with other plan provisions, U S WEST reserves the right to amend this provision relating to any remaining assets** *in the event* **of Plan termination**."

*Response*, p. 8 (emphasis in original) (referring to the defendants' Ex. B-1 Bates 1157-58) (SPD effective January 1, 1989).

The plaintiffs state that this reservation of rights clause "does not suggest there could be changes to benefits." Id.  However, the SPD also states:

> The provisions in the SPD, effective January 1, 1989, apply to active, eligible employees of Participating companies. ***This SPD is an overview of the plan.  Detailed provisions of the Plan are contained in the official Plan text, which governs in all cases.***  If you would like to review the Plan text or obtain a copy, please contact your Benefit office.

*Motion*, Ex. B-1, Bates 1145 (emphasis added).

If the SPD language conflicts with the plan language, the SPD language controls. Charter Canyon Treatment Center v. Pool Co., 153 F.3d 1132, 1136 (10th Cir. 1998).  The plans in effect at the time Kerber and Phelps retired state the following:

The Committee, with the consent of the Chairman of the Board or, at any time when there is no Chairman of the Board, the President; and subject to the approval of the Board of Directors (or without such approval in the case of changes which, in the opinion of the Committee, are dictated by the requirements of federal or state statutes applicable to the Company or other Participating Companies or authorized or made desirable by such statutes) may from time to time make changes in the Plan as set forth in this document, and the Company may terminate said Plan, but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled to hereunder.

*Motion*, Ex. A-2, Bates 3661(the 1984 Management Plan); Ex. A-3, Bates 3387 (the 1984 Occupational Plan).

The plans' language does not conflict with the SPD language. The SPD states that the company reserves the right to terminate the plan. The plans reiterate the company's reservation of rights to terminate the plans and also reserve the right to amend the plans. The Tenth Circuit Court of Appeals has stated:

[I]f a summary's language can trump language contained in the master plan documents in the event of a conflict, the documents must actually conflict. If the plan documents do not conflict, the important policy of protecting beneficiaries from misleading or false information contained in a summary plan description is not implicated. Thus, *a summary plan description which is silent on a specific term or issue cannot prevail over the master plan document*.

Canyon Treatment Center, 153 F.3d at 1136 (emphasis added).

Here the SPD is silent regarding the right to amend. Thus, it cannot prevail over the plans' language which clearly reserves the right of the Committee and others to change or terminate employee benefits subject to one exception: "when employees have previously become entitled to benefits, *i.e.* the exception applies to benefits which have, by some other mechanism,

previously become vested." Chastain v. AT & T, No. CIV-04-0281-F, 2007 WL 3357516, at *11 (W.D. Ok. Nov. 8, 2007) (examining identical plan language).

Examining the plan documents as a whole, a reasonable person in the position of the plan participant would have understood that the Pensioner Death Benefit was not contractually vested and could be amended.  The plaintiffs have failed to point to any clear and express language that the welfare benefit right was vested and not subject to change.

Because I find that the Pensioner Death Benefit is a welfare benefit that has not contractually vested, the plaintiffs are not entitled to declaratory relief.  The Motion is granted insofar as it seeks summary judgment in favor of the defendants on Claim Three.

## B.   Claim Two

Claim Two alleges that the Pensioner Death Benefit vested when excess assets were transferred from the Plan pursuant to 26 U.S.C. § 420 and, therefore, changes to the Pensioner Death Benefit violate ERISA.[8]  The defendants characterize the claim as follows:

> Plaintiffs argue the Pensioner Death Benefit vested when transfers of excess plan assets occurred in 1998 through 2001 to assist with the funding of retiree medical benefits.  (*SAC*, ¶¶ 170-73.)  In doing so, they seek to invalidate the 2003-5 Amendment that eliminated the Pensioner Death Benefit for post-2003 retirees and, therefore, their claim can only be characterized as arising under Section 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)).  *See Ross v. Rail Car Am. Group Disability Inc. Plan*, 285 F.3d 735, 740-41 (8th Cir. 2002).  That provision authorizes an action to "enjoin any act or practice which violates any provision *of this subchapter*," 29 U.S.C. § 1132(a)(3)(A) (emphasis added), or "to obtain other appropriate equitable relief (i) to redress *such* violations or (ii) to enforce *any provisions of this subchapter* or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3)(B) (emphasis added).  Thus, to

---

[8]Plaintiffs Kerber and Phelps lack standing to prosecute this claim.  *Order* [Doc. #91], pp. 7-8.  Therefore, Claim Two is advanced by plaintiffs West, Meister, and Ingemann.

prevail on a claim, Plaintiffs must prove that the challenged amendment violated a provision of subchapter I of ERISA (29 U.S.C. § 1001-1053) or the terms of the Plan. Notably, Section 420 is not part of subchapter I of ERISA, so by its terms Section 502(a)(3) does not provide a vehicle for relief. Further, the Tenth Circuit has not recognized any claim based on IRC Section 420, and does not generally allow ERISA claims based solely on the IRC. *See Stamper v. Total Petroleum, Inc. Ret. Plan for Hourly Rate Employees*, 188 F.3d 1233, 1238-39 (10th Cir. 1999). There appears to be no viable statutory basis for this claim.

*Motion*, pp. 16-17 (emphasis in original).

In response to the defendants' characterization of Claim Two, the plaintiffs clarify that Claim Two is brought under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3). *Response*, pp. 22-23. The plaintiffs rely on their arguments in support of Claim Three and assert that the Pensioner Death Benefit cannot be changed or eliminated. Id. I have found that the Pensioner Death Benefit is a welfare benefit that has not contractually vested and may be subject to reduction or elimination.[9]

The plaintiffs do not address their assertion in Claim Two that the Pensioner Death Benefit vested when the Plan Sponsor transferred assets under Section 420 of the Internal Revenue Code. To the extent the plaintiffs continue to assert this claim, they do not cite any plan language that constitutes the "clear and express language" of vesting required under Chiles

---

[9]The defendants state that in paragraphs 5 and 8 of their "Response to Defendants' Undisputed Material Facts," the plaintiffs expand Claim Two to challenge a 1993 plan amendment that froze the amount of the death benefit. *Defendants' Reply Brief in Further Support of Their Motion for Summary Judgment*, [Doc. #149] (the "Reply"), pp. 8-9. This claim was not asserted in the Second Amended Complaint, and it is not addressed in the plaintiffs' clarification of Claim Two. I will not address a claim raised for the first time in a brief opposing a dispositive motion, especially a claim purportedly raised in a statement of facts.

The Motion is granted insofar as it seeks summary judgment in favor of the defendants on Claim Two.

### C.  Claim One

Claim One is entitled "Breach of Fiduciary Duty and Equitable Estoppel Due to Failure to Disclose Material Information; Requested Equitable and Remedial Relief."  It seeks an order "forbidding Defendants and [their] successors from ever altering, modifying, eliminating or terminating Named Plaintiffs' and the proposed class of PLAN participants' expected Pension Death Benefits in the absence of a PLAN termination."

The plaintiffs assert that "since Amendment 2003-5 violates the anti-cutback provisions of ERISA Section 204(g)," the plaintiffs can "prove their claim that Plan fiduciaries have violated ERISA Section 404(a) duties to comply with ERISA's statutory requirements." *Response*, pp. 24-25.

ERISA Section 404(a), 29 U.S.C.A. § 1104(a), is a general standard of care provision for ERISA plan fiduciaries.  The United States Supreme Court has stated, however:

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.  As we said with respect to the amendment of welfare benefit plans, employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.  When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 443 (1999) (internal quotations and citations omitted).  Thus, the defendants were not acting as fiduciaries when implementing Amendment 2003-5, and they are not liable as fiduciaries under Section 404(a), 29 U.S.C.A. § 1104(a).  The

defendants are entitled to summary judgment on the plaintiffs' claim for breach of fiduciary duty.

As to the plaintiffs' claim for equitable estoppel, the Tenth Circuit Court of Appeals "has neither adopted nor rejected an equitable estoppel rule in the ERISA context." Cannon v. Group Health Serv. of Oklahoma, Inc., 77 F.3d 1270, 1277 (10th Cir. 1996). In Cannon, the circuit court applied the Eleventh Circuit's test for equitable estoppel without formally adopting or rejecting the theory. Id. at 1276-77. The Eleventh Circuit's test consists of the following elements:

"(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation." Id.

Here, as with the plaintiff in Cannon, there is an "absence of misrepresentation of any term of the plan" which would trigger the plaintiffs' "reasonable detrimental reliance." Id. at 1277. As previously discussed, the terms of the plans are not ambiguous, and the plaintiffs could not reasonably rely on their own interpretation of those terms. Therefore, the plaintiffs' equitable estoppel claim fails as a matter of law, and the defendants are entitled to summary judgment on Claim Two.

### D. Claim Four

Claim Four is brought pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), or in the alternative Section 502(a)(3), 29 U.S.C. § 1132(a)(3), for correction of "faulty plan

documents."   The plaintiffs seek equitable relief requiring the defendants to amend the Plan to declare that "the Pension Death Benefit is a vested, protected and accrued defined pension benefit" that cannot be reduced or terminated absent the Plan's termination or that language be inserted into Plan documents "memorializing the Pension Death Benefit [as] an entitlement."

Claim Four is redundant of Claims One and Two.  Sections 1132(a)(2) and (3) provide:

> A civil action may be brought . . .
>
>> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
>>
>> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . .

Under Section 1132(a)(2), the plan participants may bring a claim for relief under Section 1109.  Section 1109 addresses liability for breach of fiduciary duty.  As discussed in my analysis of Claim One, the defendants are not liable as fiduciaries.

My analyses of Claims Two and Three specifically address and dispose of the plaintiffs' claim pursuant to Section 1132(a)(3).  Accordingly, the defendants are entitled to summary judgment on Claim Four.

### E.   Plaintiffs' Motion for Partial Summary Judgment

At the end of their Response, the plaintiffs move for entry of partial summary judgment. *Response*, pp. 27-28.  Under the local rules of this Court, however, "[a] cross motion for summary judgment shall not be included in a response brief.  A cross motion shall be made in a

separate motion . . . ." D.C.COLO.LCivR 56.1B.  Accordingly, the plaintiffs' request for entry of partial summary judgment is STRICKEN.

## IV.  CONCLUSION

For the reasons stated,

IT IS ORDERED that the **Defendants' Motion for Summary Judgment and Brief in Support** is GRANTED, and summary judgment shall enter in favor of the defendants on all of the plaintiffs' claims.

IT IS FURTHER ORDERED that the plaintiffs' request for entry of partial summary judgment is STRICKEN.

IT IS FURTHER ORDERED that the defendants may have their costs upon filing a bill of costs within ten days after the entry of this order.  D.C.COLO.LCivR 54.1.

Dated September 19, 2008.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge